# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

CHRISTIAN ABLAH,

    Plaintiff,

v.

THOMAS B. CAHILL,

    Defendant.

Case No. 18-2098-DDC-TJJ

## MEMORANDUM AND ORDER

This matter is before the court on defendant Thomas B. Cahill's Motion to Dismiss (Doc. 45). This case originally involved seven plaintiffs and two defendants. But now, only the claims that plaintiff Christian Ablah has asserted against defendant Cahill remain. The other litigants have settled their claims and memorialized those outcomes in appropriate dismissal filings. *See* Docs. 78 & 85. Plaintiff Ablah, along with other plaintiffs who since have settled their claims, filed a Memorandum in Opposition to defendant's Motion (Doc. 63). Defendant has not filed a reply. For reasons explained below, the court denies defendant's Motion.

## I. Background

When considering a motion to dismiss, the court accepts facts asserted by the Amended Complaint (Doc. 30) as true and views them in the light most favorable to plaintiff. *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (citing *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). Given this requirement, the court provides the following factual background.

Plaintiff Ablah was a shareholder of Plaza Speedway Development, Inc. ("PSDI"). Defendant Cahill is a practicing attorney in Naperville, Illinois. Their dispute with each other

emerges from a maze of limited liability companies and convoluted business relationships. They produce a sizable collection of acronyms and other abbreviations which, regrettably, are needed to recite the facts[1] governing this Motion.

In 2005, two groups of investors and real estate professionals—one group from Chicago ("the Chicago Group") and one from Kansas City ("the KC Group")—agreed to form an entity to acquire land in Wyandotte County, Kansas ("the Plaza Speedway Property"), and develop that land ("the Speedway Project") by using tax increment financing ("TIF"). In 2005, a corporation known as Midwest Acquisitions, Inc., which the Chicago Group owned, contracted with landowners to buy the land that ultimately became the Speedway Project. The project depended on TIF and Transportation Development District ("TDD") proceeds to defer costs.

The Chicago Group, the Amended Complaint alleges, was responsible for designing the transaction structure and drafting documents for the Chicago and KC Groups' development of the Speedway Project. Defendant Cahill was one of the legal professionals tasked with designing and structuring the Speedway Project transactions so that TIF and TDD proceeds would be excluded from taxation under Internal Revenue Code Section 118.

On July 11, 2006, the Chicago Group created Plaza Speedway, LLC: an Illinois limited liability company that registered to do business in Kansas in November 2008. Midstates Investments, LLC—another Illinois limited liability company owned by the Chicago Group—owned 85% of Plaza Speedway, LLC. BCD Speedway, LLC—a Missouri limited liability company owned by the KC Group—owned the remaining 15% of Plaza Speedway, LLC. The Complaint alleges, on information and belief, that defendant Cahill partially was responsible for structuring the transaction in a fashion that made Plaza Speedway, LLC, the developer and

---

[1] As Part III explains, these "facts" come from the Amended Complaint (Doc. 30), and the court must assume they are true.

owner of the Plaza Speedway Property. Christos Komissopoulos—a former defendant who since has settled with all plaintiffs—prepared the original operating agreement for Plaza Speedway, LLC, the Complaint alleges on information and belief.

On December 21, 2006, the Unified Government of Wyandotte County ("the UG") adopted the Speedway Development Plan that named Plaza Speedway, LLC, as the developer. The Complaint alleges that defendant reviewed and approved the agreement between the UG and Plaza Speedway, LLC.

Then, on July 31, 2007, the Chicago Group, acting in part through defendant Cahill, created PSDI, a Kansas corporation also owned by Midstates Investments, LLC, and BCD Speedway, LLC. In September 2007, Midwest Acquisitions, Inc., assigned its contract rights with the landowners of the development site to Plaza Speedway, LLC. That same month, Plaza Speedway, LLC, assigned its rights in its agreement with the UG to PSDI. This assignment made PSDI the developer of the project. Plaza Speedway, LLC, also changed its ownership structure in September 2007. After the change, Midstates Investments, LLC, owned 60% of Plaza Speedway, LLC, and BCD Speedway, LLC, owned 40%. Plaza Speedway, LLC, purchased real estate comprising the development property and secured a mortgage for that property by executing a promissory note with VT, Inc., a lender.

In November 2007, plaintiffs David Block and Becky Barber—both have settled their claims against all defendants—sent an email to Komissopoulos. They expressed concern that a corporation needed to control the entire project for the TIF and TDD proceeds to qualify as non-taxable. Komissopoulos responded that he was aware of the issue and that he had worked with defendant Cahill and others to structure the property ownership so that the TIF and TDD proceeds would qualify as exclusions from taxable income.

In April 2008, Plaza Speedway, LLC, and PSDI entered into several agreements. They included: (1) an agreement where PSDI assumed Plaza Speedway, LLC's debt to VT, Inc.; (2) a "Development Agreement" between PSDI and Plaza Speedway, LLC; (3) Plaza Speedway, LLC, conveyed the Plaza Speedway Property to PSDI; (4) PSDI conveyed the property back to Plaza Speedway, LLC; (5) PSDI, as the project's developer, assigned the TIF and TDD proceeds to Mission Bank as a lender; (6) Mission Bank paid off the debt owed to VT, Inc., and VT, Inc., assigned the mortgage it held to Mission Bank; and (7) Plaza Speedway, LLC, signed a special warranty deed to Wal-Mart as a buyer of part of the property. The Amended Complaint alleges that defendant Cahill and Komissopoulos made the decision to convey the Plaza Speedway Property from PSDI to Plaza Speedway, LLC.

Between 2008 and 2010, parts of the Plaza Speedway Property were sold, and the sales were reported on Plaza Speedway, LLC's tax returns. And the proceeds of these sales were used to pay the loan owed to Mission Bank. In 2008, Plaza Speedway, LLC, and PSDI began spending substantial amounts of money to improve the property. PSDI submitted certificates of expenditure to the UG. These certificates certified expenses eligible for reimbursement. TIF and TDD proceeds from 2009 to 2012 were paid to Mission Bank to apply to its outstanding loan. Between 2010 and 2012, PSDI received $9,252,233 in TIF and TDD proceeds, which were excluded from taxable income.

Plaza Speedway, LLC, liquidated in January 2013, and the LLC's members contributed the entity's assets—including the title to property—to PSDI. While defendant Cahill and Komissopoulos acted as counsel, PSDI elected Subchapter S status. Electing Subchapter S status meant that the shareholders of PSDI (and not PSDI itself) would be taxed on the corporation's income. When PSDI elected Subchapter S status, plaintiff Ablah—along with the other plaintiffs

who since have settled their claims—and members of Midstates Investments, LLC, owned all of PSDI's shares.

On January 31, 2013, PSDI received $36,416,197 in TIF and TDD proceeds from the UG. The entire amount was excluded from taxable income on PSDI's 2013 tax return. But sometime after 2013, the Internal Revenue Service ("IRS") audited Plaza Speedway, LLC, and PSDI. Based on this audit, the IRS concluded that the TIF and TDD proceeds were taxable because PSDI was not the property's owner or developer. In 2016, the IRS issued a notice of proposed adjustment that included the following: (1) $9,252,233 would be added to PSDI's taxable income for the years 2010 to 2012; and (2) $36,416,197 would be added to the taxable income of PSDI's shareholders for 2013. Given PSDI's Subchapter S status, more than $36 million in additional taxable income was assessed on a pro-rata basis to PSDI's shareholders—*i.e.*, proportionally to each shareholder's ownership percentage in PSDI.

The Amended Complaint alleges that the KC Group asked for and received legal advice from defendant Cahill and Komissopoulos frequently during the Speedway Project's development. Komissopoulos corresponded with the KC Group and third parties, representing that defendant Cahill was the lawyer for the project. Defendant billed and collected at least $650,000 in attorney's fees between 2006 and 2013 for legal services provided to Plaza Speedway, LLC, and PSDI. Defendant's billing statements reflect time devoted to a number of client conferences with the KC Group and other legal services. The Amended Complaint also alleges that a member of the KC Group complained about defendant's legal bills, and a member of the Chicago Group responded that the complaining member of the KC Group should refrain from asking defendant for legal assistance.

The Amended Complaint alleges that plaintiff sustained damages that, among other things, include the avoidable cost of appealing the IRS's determination and the significant income taxes on the TIF and TDD proceeds. Plaintiff also seeks interest and penalties on those taxes that plaintiff will have to pay. The Amended Complaint also asserts that plaintiff first discovered the injury caused by defendant's negligence in 2016, when the IRS issued its determination.

## II. Choice of Law

Because diversity of citizenship confers subject matter jurisdiction on the court, it "appl[ies] the substantive law of the forum state, including its choice of law rules." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005) (first citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495–97 (1941); then citing *N.Y. Life Ins. Co. v. K N Energy, Inc.*, 80 F.3d 405, 409 (10th Cir. 1996)). Kansas is the forum state, so the court applies the substantive law of Kansas to evaluate plaintiff's claims. This includes Kansas's choice of law rules.

"'When addressing choice-of-law issues, the Kansas [appellate] courts follow the Restatement (First) of Conflict of Laws.'" *Brenner v. Oppenheimer & Co.*, 44 P.3d 364, 374 (Kan. 2002) (quoting *Layne Christensen Co. v. Zurich Can.*, 38 P.3d 757, 766 (Kan. Ct. App. 2002)). Specifically, "[i]n Kansas, tort actions are governed by the law of the state in which . . . the wrong was felt," and in cases alleging financial harm, the court looks to "the state in which . . . [plaintiff] felt that financial injury." *Doll v. Chi. Title Ins. Co.*, 246 F.R.D. 683, 690 (D. Kan. 2007) (first citing *Ling v. Jan's Liquors*, 703 P.2d 731, 735 (Kan. 1985); then citing *Fusion, Inc. v. Neb. Aluminum Castings, Inc.*, No. 95-2366-JWL, 1997 WL 51227, at *24 (D. Kan. Jan. 23, 1997)).

Here, plaintiff has alleged that defendant negligently structured the transactions for the Speedway Project. This negligence, plaintiff asserts, created an obligation requiring him to pay the costs of appealing an IRS determination and income taxes on the TIF and TDD proceeds, as well as interest and penalties on those taxes. Plaintiff also represents that he is a Kansas resident; he thus alleges he "felt" his financial injury in Kansas. Though defendant makes some arguments for applying Illinois law, the court concludes that applying Kansas law is appropriate.

### III. Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Although this rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

For a complaint to survive a motion to dismiss under Rule 12(b)(6), the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Id.* at 679 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)).

When assessing whether a plaintiff has stated a plausible claim, the court must assume that the complaint's factual allegations are true. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). But the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice'" to state a claim for relief. *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). Also, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted).

IV. **Analysis**

   A. **Threshold Standing Issue**

While preparing its Order ruling on defendant Cahill's Motion to Dismiss, the court has encountered an issue that raises a threshold question. Namely, does plaintiff Ablah have standing to assert the claim advanced by the Amended Complaint? Because standing to sue is elemental to subject matter jurisdiction, the court must resolve this threshold question before expressing any opinion about the substance of the case's claims or defenses. *See Rivera v. IRS*, 708 F. App'x 508, 513 (10th Cir. 2017) ("Under Article III of the Constitution, standing is a prerequisite to subject matter jurisdiction that [courts] must address, sua sponte if necessary, when the record reveals a colorable standing issue." (citing *United States v. Ramos*, 695 F.3d 1035, 1046 (10th Cir. 2012))).

The court's concern about standing comes from the less-than-precise nature of the allegations made by the Amended Complaint (Doc. 30). For example, it alleges that the IRS audited the tax returns of "LLC and of Inc." Doc. 30 at 8 (Am. Compl. ¶ 37). The Amended Complaint defines these abbreviations to mean Plaza Speedway, LLC, *id.* at 4 (Am. Compl. ¶

8

11), and Plaza Speedway Development, Inc. (or "PSDI"), *id.* at 1 (Am. Compl. ¶1.a). It also alleges that this audit increased "the taxable income of Inc."—PSDI—by more than $45 million. It then claims that "Plaintiffs" will have "to pay significant income taxes" and "interest and penalties on such taxes" and that "Plaintiffs" sustained these damages because of defendant Cahill's negligence. *Id.* at 11 (Am. Compl. ¶ 55).

While PSDI was a plaintiff in this case, this allegation made sense—the IRS had increased PSDI's tax liability and defendant's negligence allegedly had caused that increase. But PSDI since has settled. So, the question is, how did plaintiff Ablah sustain increased tax liability? The Amended Complaint theorizes that because PSDI had elected Subchapter S status, "[its] income . . . would be taxed to its shareholders." *See id.* at 8 (Am. Compl. ¶ 32). So, it would seem, an increased tax liability for PSDI produced a derivatively increased tax liability for plaintiff Ablah—one of PSDI's shareholders. And this increase represents the damages plaintiff Ablah sustained because of defendant Cahill's negligence.

Plaintiff also briefly argues that he has standing to bring his claim as a shareholder. *See* Doc. 63 at 25–26. His argument cites *Richards v. Bryan*, 879 P.2d 638, 662–63 (Kan. Ct. App. 1994), which recognized an exception for shareholders of closely held corporations to bring direct actions. *See Richards*, 879 P.2d at 648 (concluding that "if a corporation is closely held, a court, in its discretion, may treat an action raising derivative claims as a direct action" by applying a factor test). But defendant, in his moving papers, never discusses whether plaintiff has standing to bring his claim. And plaintiff identifies no particular facts to persuade the court that the *Richards* exception for closely held corporations applies to the facts alleged in this case. Instead, plaintiff merely asserts that the Amended Complaint contains facts demonstrating plaintiff's standing under the *Richards* exception.

9

In the next section, the court outlines the legal standard differentiating between direct and derivative standing. Then, in part C, the court identifies the standing problem presented by plaintiff's current allegations.

### B. Direct vs. Derivative Standing

Generally, "[a] shareholder may only litigate as an individual if the wrong to the corporation inflicts a distinct and disproportionate injury on the shareholder, or if the action involves a contractual right of the shareholder which exists independently of any right of the corporation." *Richards*, 879 P.2d at 646 (first citing *Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 383 (7th Cir. 1990); then citing *Moran v. Household Intern., Inc.*, 490 A.2d 1059, 1070 (Del. Ch. 1985)). "Whether a cause of action is individual or derivative must be determined from the nature of the wrong alleged and the relief, if any, which could result if plaintiff were to prevail." *Id.* at 646–47 (internal quotations omitted).

The court must consider "who suffered the alleged harm and who would receive the benefit of the recovery" to determine "whether an action is derivative or direct." *Idstrom v. All. Radiology, P.A.*, No. 115,099, 2017 WL 129926, at *3–4 (Kan. Ct. App. Jan. 13, 2017). "The key inquiry is whether the plaintiff has demonstrated he or she can prevail on the alleged claims without showing an injury to the corporation." *Id.* at *4 (citing *Lightner v. Lightner*, 266 P.3d 539, 545 (Kan. Ct. App. 2011)).

### C. Standing Problems Presented by the Current Allegations

The allegations in plaintiff's Amended Complaint create two main standing issues.

*First*, the Kansas Court of Appeals has limited the *Richards* exception to suits by a "minority shareholder . . . against majority directors, officers, or directors for breach of a fiduciary duty." *Sparks v. CBIZ Accounting, Tax & Advisory of Kan. City, Inc.*, 142 P.3d 749,

10

750 (Kan. Ct. App. 2006) ("It is a mischievous suggestion that the exception should be extended to permit litigation by a minority shareholder against a third-party not owing a contractual duty to the shareholder. Such an exception would disregard the distinct nature of a corporation as a legal entity and allow an individual shareholder damages that rightfully belong to the corporation."). No authority known to the court has extended *Richards* to suits by a shareholder against third parties.

*Second*, several courts have questioned whether shareholders may base their standing to bring direct actions upon the unique tax treatment given by federal tax law to Subchapter S corporations—*i.e.*, imposing the corporation's tax liability on individual shareholders. For example, in *Economic Enterprises, Inc. v. T.D. Bank N.A.*, No. 3:10-cv-157 (VLB), 2011 WL 446891, at *4–5 (D. Conn. Feb. 3, 2011), the sole shareholder of a Subchapter S corporation argued that he had "standing to assert a personal claim based upon the alleged harm to [the corporation] because," as a Subchapter S corporation, "all of the losses [were] passed through to him." *Id.* at *4 (internal quotations omitted). But the court did not find the plaintiff's "pass through" argument persuasive. *See id.* (internal quotations omitted). The complaint in that case, the Connecticut federal court explained, "fail[ed] to allege any injury to [the plaintiff] separate and distinct from that suffered by [the corporation]." *Id.* at *5. Allowing the plaintiff to recover as a shareholder, the court ruled, "would permit both the corporation and its shareholder to recover for the same loss, requiring complex allocation of damages." *Id.*

The Eighth Circuit also has discussed the shareholder standing issue in the context of bankruptcy appellate proceedings. In *In re AFY*, 734 F.3d 810, 820–21 (8th Cir. 2013), the two sole shareholders of a Subchapter S corporation—the bankruptcy debtor in the case—challenged a bankruptcy court's orders. The Circuit concluded that "[a]ny impact on the [shareholders']

11

personal tax liability is an indirect, rather than a direct, consequence," and "[t]he shareholder standing rule prevents [shareholders] from obtaining standing on this basis." *Id.* at 820 (first citing *In re Troutman Enters., Inc.*, 286 F.3d 359, 365 (6th Cir. 2002); then citing *In re Dein Host, Inc.*, 835 F.2d 402, 405–06 (1st Cir. 1987)).

The court is mindful that plaintiff might have intended for the Amended Complaint to assert a claim for damages or relief that would survive the derivative standing problem. But, at this stage, the court cannot simply assume that plaintiff himself has sustained an injury that will support Article III's standing requirement.[2]

Finally, the court notes that the Amended Complaint arguably *may* assert that plaintiff sustained damages in his own name. *See* Doc. 30 at 11 (Am. Compl. ¶ 54) (asserting that defendant's negligence caused "Plaintiffs" to sustain damages consisting of "unnecessary cost and expense associated with the administrative appeal of the IRS decision"). While this interpretation of plaintiff's current pleading is possible, standing, "'like other jurisdictional inquiries, cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record.'" *Econ. Enters.*, 2011 WL 446891, at *2 (quoting *Thompson v. Cty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994)); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) ("[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute.").

---

[2] The standing analysis in *Economic Enterprises* is based on the substantive law of Connecticut because that case involved a Connecticut corporation. *See* 2011 WL 446891, at *3. Specifically, Connecticut law required the shareholder plaintiff asserting a claim in his own name to allege "'an injury that is separate and distinct from any other shareholder or by the corporation.'" *Id.* (quoting *Smith v. Snyder*, 839 A.2d 589, 594 (Conn. 2004)). Here, the related corporation—PSDI—is a Kansas corporation. *See* Doc. 30 at 1 (Am. Compl. ¶ 1.a). And Kansas law, in substance, tracks the Connecticut authority on this requirement. *See Richards*, 879 P.2d at 646 ("A shareholder may only litigate as an individual if the wrong to the corporation inflicts a distinct and disproportionate injury on the shareholder, or if the action involves a contractual right of the shareholder which exists independently of any right of the corporation.").

12

Plaintiffs filed the Amended Complaint when there were seven plaintiffs—including PSDI. They did not calibrate their allegation in paragraph 54 carefully enough for the court to discern whether each plaintiff had sustained "cost and expense" in its own name, or, instead, whether just PSDI had sustained those alleged losses. *See* Doc. 30 at 11 (Am. Compl. ¶ 54). On a matter that goes to the root of plaintiff Ablah's standing to sue—and, thus, subject matter jurisdiction over his suit—the court is unwilling to accept an allegation that isn't as specific as it needs to be.

## V. Conclusion

For the reasons explained in this Order, the court orders plaintiff Christian Ablah, within **15 days of this Order**, to file either: (1) a Second Amended Complaint asserting only his claims against defendant Cahill and identifying explicitly the "injury-in-fact," *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), that he himself allegedly has sustained; or (2) a notice that he cannot amend the Amended Complaint in a fashion that will satisfy this elemental standing requirement.

If plaintiff files the second option described above, the court will conclude that plaintiff cannot discharge his obligation to establish subject matter jurisdiction. In that event, the court plans to remand the case to the District Court of Wyandotte County, Kansas, so that the state court may evaluate any standing requirement that Kansas applies to its courts. Kansas state courts may approach the issue of standing differently than Article III requires, so remand, and not dismissal, is appropriate. *See Int'l Primate Prot. League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 87–88 (1991) ("Section 1447(c) of Title 28 provides that, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction [over a case removed from state court], the case shall be remanded."). Conversely, if plaintiff Ablah files a

second amended complaint, defendant Cahill will have the time permitted by the Federal Rules of Civil Procedure to file any response appropriate under those rules.

Finally, given the conclusions and rulings made in this Order, the court denies the pending Motion to Dismiss (Doc. 45) as moot.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Thomas B. Cahill's Motion to Dismiss (Doc. 45) is denied as moot.

**IT IS FURTHER ORDERED THAT** plaintiff Christian Ablah must submit, within **15 days of this Order**, either a second amended complaint or a notice, as described above.

**IT IS SO ORDERED.**

**Dated this 26th day of March, 2019, at Kansas City, Kansas.**

                                        **s/ Daniel D. Crabtree**
                                        **Daniel D. Crabtree**
                                        **United States District Judge**